UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| KIMBERLY A. THROGMORTON, on behalf of The UNITED STATES OF AMERICA, | CIVIL ACTION NO. _____ |
| PLAINTIFF/Relator, | FILED UNDER SEAL<br>JURY TRIAL DEMANDED |
| VERSUS | |
| SHREVEPORT PROSTHETICS, INC. and NEURO PROSTHETICS, INC. d/b/a TEXAS PROSTHETIC CENTER | JUDGE _____ |
| | MAGISTRATE JUDGE _____ |
| DEFENDANTS | |

## FALSE CLAIMS ACT COMPLAINT
### "QUI TAM"

The UNITED STATES OF AMERICA, by and through *qui tam* Relator, KIMBERLY A. THROGMORTON, brings this action under 31 U.S.C. § 3729, *et seq.* ("False Claims Act") to recover from SHREVEPORT PROSTHETICS, INC. (hereinafter "SPI") and NEURO PROSTHETICS, INC. d/b/a TEXAS PROSTHETIC CENTER (hereinafter "TPC") for all damages, penalties, attorney fees, costs, and any other remedy available under the False Claims Act on behalf of the UNITED STATES OF AMERICA and herself and, respectfully, represents the following:

### I. INTRODUCTION

1.     This is an action to recover damages, civil penalties, attorney fees, costs, and any other remedies on behalf of the United States of America for violations of the

False Claims Act arising from false or fraudulent claims for payment or approval and conspiring to present false or fraudulent claims for payment or approval by the defendants, their agents, employees, or co-conspirators, or any combination thereof, with respect to false claims for prosthetics for upper and lower amputees, for which claims were made to Medicare and the federal Medicaid Program.

2.      Realtor's allegations relate to false or fraudulent claims present by Defendant TPC to Medicare for payment of services, which were not rendered at or by TPC in Texas but rendered by Defendant SPI in Louisiana, and false or fraudulent claims presented by Defendant SPI to Medicare for payment of services, which were rendered when Defendant SPI was not enrolled in the Medicare program and not eligible to receive payment from Medicare.

3.      Relator's allegations relate to false or fraudulent claims presented by Defendant TPC to Medicaid for payment of services, which were not rendered at or by TPC in Texas but rendered by Defendant SPI in Louisiana, and false or fraudulent claims presented by Defendant SPI to Medicaid for payment of services, which were rendered when Defendant SPI was not enrolled in the Medicaid program and not eligible to receive payment from Medicare.

## II. JURISDICTION

4.      This action arises under the laws of the United States to redress violations of the federal False Claims Act, 31 U.S.C. § 3729, *et seq*.

5.      Subject-matter jurisdiction is conferred by 31 U.S.C. § 3732 and 28 U.S.C. § 1331.

6.      There have been no public disclosures of the allegations or transactions contained herein that bar jurisdiction under 31 U.S.C. § 3730(e).

7.      Relator is the original source of the information upon which this Complaint is based, as that phrase is used in the federal FCA, and she provided disclosures of the allegations of this Complaint to the United States prior to filing.

8.      This Court has personal jurisdiction over the Defendant SPI because it is located within this district and acts as a provider of health care services and products to federal health care program beneficiaries, including Medicare and Medicaid beneficiaries, within the Western District of Louisiana.

9.      This Court has personal jurisdiction over the Defendant TPC because all or a substantial part of the events giving rise to the claims set forth herein occurred within this judicial district as it conspired with Defendant SPI for Defendant TPC to receive payment for health care services and products performed by Defendant SPI within the Western District of Louisiana.

10.     Each Defendant regularly performs healthcare services and submits claims for payment to the federal and state health care programs, including, but not limited to Medicare and Medicaid, and accordingly, is subject to the jurisdiction of this Court.

### III. VENUE

11.     Venue exists in the United States District Court for the Western District of Louisiana pursuant to 31 U.S.C. § 3730(b)(1) because all of the defendants have at least minimum contacts with the United States, and all the defendants can be found in, reside, or transact or have transacted business in the Western District of Louisiana.

## IV. PARTIES

12.     Relator, KIMBERLY A. THROGMORTON, (hereinafter "Relator") is a major resident and domiciliary of Louisiana and citizen of the United States.

13.     Defendant, SHREVEPORT PROSTHETICS, INC., is a Louisiana Corporation, whose principal office is located at 745 Olive Street, Suite 111, Shreveport, Louisiana 71104.

14.     The agent for service of process of Defendant, SHREVEPORT PROSTHETICS, INC., is Pia Bayly, 745 Olive Street, Suite 111, Shreveport, Louisiana 71104.

15.     Defendant, NEURO PROSTHETICS, INC. d/b/a TEXAS PROSTHETIC CENTER, is a Texas Corporation, whose principal office is located at 500 Medical Center Boulevard, Suite 220, Conroe, Texas 77304.

16.     The agent for service of process of Defendant, NEURO PROSTHETICS, INC. d/b/a TEXAS PROSTHETIC CENTER, is the Bailey Law Firm, 2203 Timberloch Place, Suite 215, The Woodlands, Texas 77380.

## V.  FACTS

**Background Facts**

17.     The Medicare Program was established by congress in 1965 under Title XVIII of the Social Security Act to provide health insurance for the elderly and disabled. Medicare is a health insurance program for people aged 65 and older, people under 65 with certain disabilities, and anyone with end-stage renal disease.

18.     Medicare has two parts—Part A and Part B.  Part A generally covers hospitalizations.  Part B covers physician services and other medical services not covered by Part B.

19.     Payments from the Medicare Program come from a trust fund, known as the Medicare Trust Fund, which is funded through payroll deductions taken from workers, in addition to government contributions.  Since its inception, the Medicare Program has enabled the elderly and disabled to obtain necessary medical services from medical providers throughout the United States.

20.     The Medicare Program is administered through the United States Department of Health and Human Services and, specifically, through the Centers for Medicare and Medicaid Services ("CMS"), an agency of the Department.

21.     Medicaid was created in 1965, at the same time as Medicare, when Title XIX was added to the Social Security Act.  The Medicaid Program aids the states in furnishing medical assistance to eligible needy persons, including indigent and disabled people.  Medicaid is the largest source of funding for medical and health-related services for some of the poorest people.

22.     Medicaid is a cooperative federal-state public assistance program, which is administered by the individual states.

23.     The Louisiana Department of Health and Hospitals administers the Medicaid Program in the State of Louisiana.

24.     Funding for Medicaid is shared between the federal government and those state governments that choose to participate in the program.  For the fiscal year 2016, the

federal government provides 63.6% of the funding for Louisiana's Medicaid Program, with the remaining funding coming from the State of Louisiana.

25.     The financial impact of the Medicare and Medicaid Programs create an incentive and opportunity for pervasive fraud and abuse.

**Organization of Shreveport Prosthetics, Inc.**

26.     Defendant, SHREVEPORT PROSTHETICS, INC. (SPI), is a Louisiana corporation opened sometime in September of 2012 by its President/Director, Schuyler Nelson.

27.     SPI states that it is a "state-of-art clinical facility that provides advanced technology…for each patient."  SPI also claims that it is the "leader of upper and lower extremity prosthetics on the market today…."

28.     Relator, KIMBERLY A. THROGMORTON, was hired as the Office Administrator/Billing Specialist for Defendant, SHREVEPORT PROSTHETICS, INC., on September 29, 2016.  Relator had no background or training in billing or insurance administration.

29.     Relator's job duties with SPI included billing Medicare, Medicaid and private insurers for the prosthetics, i.e. durable medical equipment (hereinafter "DME"), prescribed by the patient's treating physician, for payment.  Relator was provided a five (5) day in-office training from Sara Assi, the Chief Operating Officer for SPI.

30.     Relator's immediate supervisor in Shreveport, Louisiana was Linnae Magyar, the Marketing Director/Patient Coordinator for SPI.

31.     In addition to Linnae Magyar, Relator reported to Sara Assi, the Chief Operating Officer for SPI, and Pia Bayly, the Chief Financial Officer for SPI.

32.     On information and belief, Ronald G. Nelson, father of President/Director Schyuler Nelson, was a manager for TPC, and he was a former owner of TPC.

33.     On information and belief, Ronald G. Nelson was a manager of SPI and has, or had, some ownership interest in SPI.

34.     Other supervisors of SPI told Relator that Ronald Nelson has some supervisory capacity at SPI, and Realtor must comply with requests of Ronald Nelson on behalf of SPI.

**Filing of Claims for Payment from Medicare and Medicaid**

35.     Since September 29, 2016, Relator would input patient information, and all necessary documentation, into the software to submit SPI invoicing for payment from Medicare.  SPI submitted Medicare claims through PCACE software.

36.     Since September 29, 2016, Relator would input patient information, and all necessary documentation, into the software to submit SPI invoicing for payment from Medicaid.  SPI submitted Medicaid claims by mail to the State of Louisiana.

37.     Relator did not bill the patient, as instructed by Sara Assi during the in-office training, the portion that was not covered by Medicare, typically twenty (20%) percent of the total allowable amount.  Sara Assi instructed Relator to prepare an invoice, without sending the invoice to the patient, and hold it for a write-off, presumably on SPI's Federal and State income taxes.

**Loss of Medicare and Medicaid Participation**

38.     On information and belief as of December 16, 2016, SPI was no longer a participant in the Medicare Program and was, accordingly, ineligible to receive payment from Medicare for services rendered and/or DME that SPI provided to Medicare patients.

39.     On information and belief as of December 16, 2016, SPI was no longer a participant in the Medicaid Program and was, accordingly, ineligible to receive payment from Medicaid for services rendered and/or DME that SPI provided to Medicaid patients.

40.     During the time period of December 16, 2016 through May 11, 2017 at the instruction and direction of her employer, SPI, and supervisors, Relator submitted claims on behalf of SPI for payment from Medicare and Medicaid.

41.     On or about April 20, 2017, Relator was working on claims for a patient, who was living in Louisiana (hereinafter referred to "WB" to protect his privacy).  WB's Medicare address was still California.

42.     Unsure of how or where to submit the claim, Relator was advised by her supervisor, Sara Assi, to submit WB's claim to Jurisdiction D, which covers the State of California.  Assi talked Relator through the process of changing the PCACE software to submit the claim.  Assi instructed Relator to separate Jurisdiction C, which covers the State of Louisiana, and Jurisdiction D claims, as they could not be grouped together in the same PCACE submission.  Assi informed Relator that the payment from Medicare would come in the form of a check via U.S. Mail since SPI was not set up to receive an Electronic Funds Transfer (EFT) from Jurisdiction D.

43.     On April 27, 2017, Relator received the completed paperwork for WB to submit through PCACE for payment from Medicare.  Relator submitted the two claims, one for each prosthetic, for payment from Medicare Jurisdiction D after having submitted the Jurisdiction C claims.

44.     On April 28, 2017, Relator contacted IVR to ensure that WB's claim was submitted properly and received by Medicare.  Relator was advised that the claim on behalf of WB was not yet appearing in the system.

45.     On May 1, 2017, Relator contacted IVR to follow up on WB's two claim submissions.  The automated system noted that a claim was received and SPI would receive a payment of $4,853.38 by mail.  No other claims were pending with the same date of service, so Relator requested to speak with a representative as there should have been two.

46.     Relator spoke with a representative for Jurisdiction D and was advised that SPI did not have an account with Jurisdiction D and their claims could not be seen as a result.  Relator was advised to contact the national clearinghouse (NSC) for Medicare.

47.     On that same day, Relator contacted NSC.  Brittany with NSC advised Relator that the claims were submitted but that SPI could not receive payments currently.  Brittany advised that the NPI (National Provider Identifier) and PTAN (Provider Transaction Access Number) for SPI had been terminated on December 31, 2016, for failing to renew.

48.     Immediately after speaking with NSC on May 1, 2017, Relator contacted Assi to advise of the situation concerning the termination of SPI's Medicare and Medicaid enrollment.

49.     On May 3, 2017, TPC, through "Brittany" from TPC contacted Relator and requested Relator to send WB's paperwork to TPC, so Brittany could submit WB's claims for SPI.  Relator advised Brittany that WB's claims had previously been submitted and that SPI's enrollment in Medicare and Medicaid had been terminated.

50.     On that same day, Sara Assi contacted Relator and berated Relator for the problems SPI was having relative to WB's claims and termination of SPI's Medicare and Medicaid enrollment.

51.     On May 4, 2017, Linnae Magyar had a meeting with Relator and Sara Goldberg, SPI's Prosthetist, about upcoming changes to SPI's operations and billing. Magyar advised that SPI would submit all of its current patients, as well as all scheduled upcoming new patients, to Brittany with TPC in Conroe, Texas.  Brittany was going to email Relator all new paperwork, under TPC, for SPI's current and future patients and their prescribing physicians to complete.  The claims for payment from Medicare and Medicaid for SPI's current and future patients would be submitted by TPC until SPI could get re-enrolled with Medicare and Medicaid.

52.     At this meeting, Magyar told Relator that several of SPI's patient's paperwork would have to be completely redone under TPC that had not yet been submitted to Medicare or Medicaid.  These SPI patients had already been evaluated

and/or treated by SPI.  Magyar stated she would personally hand-deliver the paperwork to the physicians and/or patients and explain the situation to them.

53.     Additionally at this meeting, Magyar told Goldberg that Goldberg would not sign any of the delivery tickets, which is required when the prosthetic is delivered to the patient, but only the patient was to sign the delivery ticket.  Magyar advised that Ashley Perreira, the TPC Prosthetist, would review and sign the delivery tickets, as if Perreira had evaluated these patients, fitted the devices, "checked off" on the prescriptions, and delivered devices to these patients, after the files had been shipped to TPC from SPI.  Perreira had never seen or evaluated any of the SPI patients.

54.     Relator questioned Magyar at the May 4, 2017 meeting concerning whether it was legal for TPC to submit for claims payments from Medicare and Medicaid for patients seen and/or treated by SPI.

55.     After the meeting with Magyar, Relator and Goldberg concluded, Relator received a call from Ronald Nelson, who advised that it was legal for Perreira to review the paperwork and sign off on Goldberg's decisions for SPI's patients as long as SPI was submitting claims under one of the affiliated active NPIs.

56.     Between May 4, 2017 and May 11, 2017, Relator, at the instruction of Ronald Nelson and Magyar, and Magyar re-typed all of SPI's current patient's paperwork under TPC.  Several of SPI's patient's paperwork that had been changed was delivered to TPC.

57.     On May 16, 2017, Relator received an email from Magyar that Medicare would inspect SPI in the near future and that Assi requested that no one mention that SPI

is part of another company.  Magyar stated "[w]e are Shreveport Prosthetics as far as [Medicare is] concerned since this is the only Medicare number they are looking at there is no other Shreveport Prosthetics office."  Going further, she said "[s]o please don't mentioned [sic] other offices."

58.     On May 17, 2017 after feeling more and more uncomfortable with the directives from management of SPI, including Assi, Magyar, and Ronald Nelson, Relator contacted Medicare prior to going to work that day.  Relator was told by operator Talea that as a Tier 2 vendor that SPI could not submit claims for services and products done in Louisiana under a Texas NPI.  Following that telephone call with Medicare, Relator emailed Ronald Nelson, Magyar, Assi, Goldberg, Lauren Swift (a Patient Care Coordinator at SPI), and Brittany (with TPC) advising them that the practice of TPC submitting claims to Medicare for SPI was not proper and that she would not participate in the scheme.

59.     Approximately five (5) minutes after submitting the email to the supervisors and/or owners of SPI and TPC, all emails at SPI, through Gmail, were locked out, and Relator could not access anything further.

60.     Subsequent to sending the email on May 17, 2017, Ronald Nelson called Relator four (4) times to defend his actions in falsely submitting claims for SPI through TPC for Medicare and/or Medicaid.  Ronald Nelson made sure to make advise Relator that she needed to speak to his attorney, Brian Flood, and Medicare consultant, Zita Upchurch.

61.     Ronald Nelson additionally advised Relator that he was not an owner of SPI, which was not Relator's understanding at the time of her hiring in September 2016, and that his son, Schuyler Nelson, was the owner.  Ronald Nelson continued in asking Relator whether she would be more comfortable if Ashley Perreira was brought into Shreveport.

62.     At 4:55 p.m. on May 17, 2017, Assi and Brian Flood, attorney at Husch & Blackwell in Austin, Texas, called Realtor and placed Relator on administrative leave as a result of the email, sent earlier that day, until an investigation could be completed.  Assi requested that Relator leave her keys to SPI be left with Magyar.  Relator was not advised further about the "administrative leave".

63.     On May 18, 2017, Relator contacted CMS and requested that she be removed as administrator for SPI as the IVANS NOW administrator.  IVANS NOW is an online access to check the status of claims in real time instead of checking the status of claims by telephone.

64.     That same day, Relator contacted Medicaid of Louisiana technical support and requested to be removed from Medicaid's list of claims submissioners.

65.     To date, Relator has not received any explanation of the reason for the administrative leave other than her email to the owners and managers of SPI and TPC restating discomfort with SPI submitting claims for payment from Medicare and Medicaid through TPC.  Relator was paid by SPI for the two weeks of administrative leave prior to her resignation.

66.     On May 31, 2017, Relator resigned from her position with SPI as a result of her witnessing the unethical acts of Ronald Nelson, Sara Assi and Linnae Magyar and other employees of SPI and TPC on behalf of SPI and TPC.

**Claims**

67.     From December 16, 2016 through December 31, 2016, SPI submitted two (2) claims for $148,608.17 in services and/or products (DME) to Medicare for payment.

68.     From December 16, 2016 through December 31, 2016, Medicare paid SPI $9,856.04 for services rendered to and/or products provided, after December 16, 2016, to Medicare recipients by SPI in Louisiana

69.     During January of 2017, SPI submitted nine (9) claims for $115,128.49 in services and/or products (DME) to Medicare for payment.

70.     During January of 2017, Medicare paid SPI $82,207.20 for services rendered to and/or products provided, after December 16, 2016, to Medicare recipients by SPI in Louisiana.

71.     During February of 2017, SPI submitted eight (8) claims for $124,087.87 in services and/or products to Medicare for payment when not an eligible provider.

72.     During February of 2017, Medicare paid SPI $46,346.36 for services rendered to and/or products provided, after December 16, 2016, to Medicare recipients by SPI in Louisiana when not an eligible provider.

73.      During March of 2017, SPI submitted sixteen (16) claims for $304,516.63 in services and/or products (DME) to Medicare for payment when not an eligible provider.

74.     During March of 2017, Medicare paid SPI $130,992.49 for services rendered to and/or products provided, after December 16, 2016, to Medicare recipients by SPI in Louisiana.

75.     During April of 2017, SPI submitted eleven (11) claims for $228,207.92 in services and/or products (DME) to Medicare for payment when not an eligible provider.

76.     During April of 2017, Medicare paid SPI $157,303.96 for services rendered to and/or products provided, after December 16, 2016, to Medicare recipients by SPI in Louisiana when not an eligible provider.

77.     From May 1, 2017 through May 5, 2017, SPI submitted five (5) claims for $71,836.82 in services and/or products (DME) to Medicare for payment when not an eligible provider.

78.     From May 1, 2017 through May 21, 2017, Medicare paid SPI $114,003.63 for services rendered to and/or products provided, after December 16, 2016, to Medicare recipients by SPI in Louisiana when not an eligible provider.

79.     Relator knows of at least $63,244.25 for two (2) claims submitted by SPI for services and/or products (DME) to Medicaid for payment from January 1, 2017 to May 3, 2017 when not an eligible provider.  Relator does not know the full amount paid by Medicaid to SPI for services rendered to and/or products provided, after December 16, 2016, in Louisiana when not an eligible provider.

80.     On information and belief between May 2 and May 3, 2017, TPC submitted $42,053.23 in several claims to Medicare for services rendered by SPI in Louisiana when not an eligible provider.

## VI.  APPLICABLE LAW

81.     The False Claims Act creates personal liability for any person who (1) knowingly presents, or causes to be presented, to the government a false or fraudulent claim for payment; (2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim to be paid by the government; or (3) conspires to do either of the former.

82.     Under the False Claims Act, "knowing" and "knowingly" means that a person has (1) actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information.

83.  It is a violation of the False Claims Act to not only make a false statement or record for payment but also to engage in a course of conduct that causes the government to pay a false or fraudulent claim for payment.

## VII.  CAUSES OF ACTION

### COUNT I – Medicare payments to TPC for services rendered by SPI

84.     Relator incorporates and reurges all of the foregoing allegations herein.

85.     Based upon all of the foregoing acts described, Defendant TPC presented claims to Medicare for payment for services that were not rendered by TPC but were rendered by Defendant SPI, in the State of Louisiana.

86.     Defendants SPI and TPC falsified records and/or statements for claims ultimately presented to Medicare for payment for services that were not rendered by TPC but were rendered by Defendant SPI, in the State of Louisiana.

87.     Defendants SPI and TPC conspired together to falsify records and have TPC present false and/or fraudulent claims for payment by Medicare.

88.     The United States, unaware of the falsity of these claims, records and statements and unaware of the conspiracy between SPI and TPC, paid money to Defendant TPC and/or Defendant SPI for the fraudulent or false claims.

89.     The United States and the public have been damaged as a result of the Defendants' actions in violating the False Claims Act.

**COUNT II – Medicare payments to SPI when not enrolled in Medicare or eligible**

90.     Relator incorporates and reurges all of the foregoing allegations herein.

91.     Based upon all of the foregoing acts described, Defendant SPI presented false and/or fraudulent claims to Medicare for payment for services while Defendant SPI was not a participant in the Medicare Program and was, accordingly, ineligible to receive payment from Medicare.

92.     The United States, unaware of the falsity of these claims, records and statements and unaware of the ineligibility of Defendant SPI, paid money to Defendant SPI for the fraudulent or false claims.

93.     The United States and the public have been damaged as a result of the Defendant's actions in violating the False Claims Act.

**COUNT III – Medicaid payments to SPI when not enrolled in Medicaid or eligible**

94.     Relator incorporates and reurges all of the foregoing allegations herein.

95.     Based upon all of the foregoing acts described, Defendant SPI presented false and/or fraudulent claims to Medicaid, through the Louisiana Medicaid Program, which is almost wholly funded through the Government, for payment for services while Defendant SPI was not a participant in the Medicaid Program and was, accordingly, ineligible to receive payment from Medicaid.

96.     The United States, unaware of the falsity of these claims, records and statements and unaware of the ineligibility of Defendant SPI, paid money to the State of Louisiana, through the Medicaid Program, who ultimately paid Defendant SPI for the fraudulent or false claims.

97.     The United States and the public have been damaged as a result of the Defendant's actions in violating the False Claims Act.

## **RELIEF REQUESTED**

WHEREFORE, PLAINTIFF, THE UNITED STATES OF AMERICA, by and through *qui tam* Relator, KIMBERLY A. THROGMORTON PRAYS that:

98.     Judgment be entered herein, after due proceedings had, in favor of the plaintiff, the UNITED STATES OF AMERICA, and against Defendants, SHREVEPORT PROSTHETICS, INC. and NEURO PROSTHETICS, INC. d/b/a TEXAS PROSTHETIC CENTER, for:

A.     All civil penalties allowed pursuant to 31 U.S.C. § 3729, *et seq.*; and,

B.     Three times the amount of damages sustained by the UNITED STATES OF AMERICA because of the actions alleged herein, pursuant to 31 U.S.C. § 3729, *et seq*.

99.    Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d).

101.    Relator be awarded all costs of this actions, including attorneys' fees, costs and expenses of this Action.

102.    For any and all other relief allowed by law.

Respectfully submitted,

LOBRANO LAW FIRM, LLC


223 Fannin Street                     ____s/Lisa D. Lobrano_____
Shreveport, LA  71101             LISA D. LOBRANO, Bar Roll No. 29954
(318) 524-8003                        **ATTORNEY FOR RELATOR,**
(318) 524-8004 fax                   **KIMBERLY A. THROGMORTON**
lisa@lisalobrano.com

<u>**CERTIFICATE OF SERVICE**</u>

I, Lisa D. Lobrano, undersigned attorney for Relator, hereby certifies that a true and correct copy of this Complaint and written disclosure of substantially all material evidence and information Relator possesses has been served on the Government as provided by law on this the 1st day of June, 2017.


____s/Lisa D. Lobrano_____
OF COUNSEL